1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

12
13
14
15
16
17

DROPBOX, INC.,

             Plaintiff,

      v.

SYNCHRONOSS TECHNOLOGIES, INC.,

            Defendant.

Case No. 18-CV-03685-LHK

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 57

18
19
20
21
22
23
24
25

      Plaintiff Dropbox, Inc. filed a patent infringement suit against Defendant Synchronoss Technologies, Inc. Plaintiff alleges that Defendant infringes claims of U.S. Patent No. 6,058,399 ("the '399 Patent") and U.S. Patent No. 6,178,505 ("the '505 Patent") (collectively, the "patents-in-suit"). Before the Court is Defendant's motion to dismiss, which contends that the asserted claims of the patents-in-suit fail to recite patent-eligible subject matter under 35 U.S.C. § 101. ECF No. 57. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendant's motion to dismiss the '399 Patent claims and the '505 Patent claims.

26

**I.     BACKGROUND**

27

      **A.  Factual Background**

28

1

### 1. The Parties and Technology at Issue

Plaintiff is a Delaware corporation with its principal place of business in San Francisco, California. ECF No. 49 (Amended Complaint, or "AC") at ¶ 1. Plaintiff was founded in June 2007, and launched "as a simple way for people to access their files wherever they are and share them easily." *Id.* at ¶ 10.

Defendant is a Delaware corporation with its principal place of business in Bridgewater, New Jersey, and conducts business from a permanent physical location in San Jose, California. *Id.* at ¶¶ 2, 6. Defendant sells its "Personal Cloud" product "as a white-label data backup and transfer solution to network operators or service providers, such as Verizon." *Id.* at ¶ 13. Plaintiff alleges that the "Personal Cloud" product, as well as other Synchronoss Cloud products, infringe the '399, '505, and '547 Patents. The Court next summarizes these patents.

### 2. The '399 Patent

The '399 Patent is titled "File Upload Synchronization." '399 Patent at front page. It was filed on August 28, 1997 and was issued on May 2, 2000. *Id.*

Most of the claims in the '399 Patent generally relate to uploading data files, such as from a personal computer, to a service provider, such as a vendor. *Id.* at 1:55-67. More specifically, the '399 Patent is directed to combining the user interface of an interactive connection, like a website, with a file upload connection, such as an FTP (file transfer protocol) connection. *Id.* at 6:22-31. In layman's terms, the Court understands the '399 Patent's purported innovation to be combining a user-friendly website interface with a file upload connection so that users who are not tech-savvy can easily upload data to a service provider. *Id.* at 1:37-39, 6:22-31.

The specification of the '399 Patent describes several embodiments. In one embodiment, the customer is given a software package. *Id.* at 1:55-59. When a customer requests access to the service provider, the software package creates an internet session and a separate file upload session. *Id.* at 1:60-67. The customer can control the data uploaded through the file upload session via the interactive internet session. *Id.* In another embodiment, the internet session and the file upload session are assigned a single unique session ID, and the uploaded files are associated with

2

that session ID. *Id.* at 2:64-3:3. The session ID can also be used to distinguish multiple users or multiple uploading sessions from a single user so that a single user can perform an upload in a number of sessions, not just one. *Id.* at 3:4-9. In a further embodiment, a password is associated with the session ID so that when files are uploaded using the file upload session, they are uploaded into a username and password-protected location. *Id.* at 3:16-20.



FIG.1

Figure 1 exemplifies the disclosed invention. Item 10 is the client and item 16 is the service provider. *Id.* at 6:21-22. There are two connections between the client and the service provider: a file upload connection and an interactive connection. *Id.* at 6:22-24. The file upload connection is an FTP (file transfer protocol) connection between an FTP client, item 12, and an FTP server, item 18. *Id.* at 6:24-27. The interactive connection is a WWW internet connection between a WWW client, item 14, and a WWW server, item 20. *Id.* at 6:28-31. The FTP server, item 18, and WWW server, item 20, are synchronized using a synchronization connection, item 22. *Id.* at 6:31-33. The '399 Patent continues on to give an example of using Figure 1 as applied to an image manipulation program to connect "to an outside service provider for special services which cannot be performed at home, for example, creating photographic-type hard copies or printing images on plastic objects." *Id.* at 6:53-57. When a customer "selects an outside service provider," an interactive connection (connecting items 14 and 20) is initiated via the internet through a standard web browser to connect to the WWW server (item 20). *Id.* at 6:58-64. The

image manipulation program also opens a file upload [] connection (connecting items 12 and 18), also via the internet. *Id.* at 6:64-66. The service provider (item 16) assigns a unique session ID to the combined file upload connection and interactive connection. *Id.* at 7:3-5. After the session ID is assigned, the FTP client (item 12) starts uploading image files when a file upload connection is established. *Id.* at 7:41-43. However, in one embodiment, the consumer can interact with the service provider via the interactive connection before any images are uploaded "by viewing and manipulating thumbnail images, full size images or image names." *Id.* at 7:58-65.

Plaintiff asserts that Defendant "directly infringed one or more claims of the '399 Patent." AC at ¶ 29. Defendant's motion to dismiss focuses on claims 1, 25, 43, and 46.[1] These claims recite:

1. A method of synchronizing an interactive connection and a non-interactive data transfer connection between a client and a service provider, comprising:

creating an interactive connection;

creating a data transfer connection; and

generating a single session ID for the two connections, which ID associates between the two connections.

*Id.* at 11:58-64.

25. Apparatus for uploading data files, comprising:

a file upload connection server;

an interactive connection server; and

a synchronizer which synchronizes the operation of respective connections formed by the file upload connection server and by the interactive connection server.

*Id.* at 13:19-24.

43. A method of local file information display, comprising:

uploading a list of file information for a plurality of local files to a remote server;

---

[1] Plaintiff has not identified any representative claims of the '399 Patent. As discussed below, the Court finds claims 1, 25, 43, and 46 to be representative of the '399 Patent.

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

generating a data display at the remote server; and

locally displaying said data display, wherein said data display includes local data not

downloaded from the remote server, responsive to said local file information.

*Id.* at 14:32-39.

46. A method of synchronized file upload, from an upload client to an upload server,

comprising:

connecting from said client to said server;

receiving information comprising a username at said client from said server; and

uploading files from said client to said server, utilizing said information.

*Id.* at 14:46-53.

### 3. The '505 Patent

The '505 Patent is titled "Secure Delivery of Information in a Network." '505 Patent at

front page. The patent generally relates to data security and is specifically directed to "providing

only as much authentication and encryption security as is required for a given user, a given path

through the network [to a given information resource], and a given [information] resource." *Id.* at

5:67-6:3. Therefore, a user's access to an information resource is dependent on multiple types of

authentication and encryption methods.

Each information resource is assigned a "sensitivity level." *Id.* at 6:6. Each user is

identified "according to one or more modes of identification such as an IP address, a token, or a

certificate." *Id.* at 6:9-11. In turn, "each of these modes of identification is assigned a trust level

from the same set of names as the sensitivity levels." *Id.* at 6:11-13. In other words, the trust levels

and the sensitivity levels have the same names. "The path . . . through the network from the user to

the location of the information resource also has a trust level." *Id.* at 6:20-22.

When a given user requests access to an information resource, an "access filter will permit

the user to access the information resource only if the trust level of the path [through the network

from the user to the location of the information resource] is no lower than the sensitivity level of

the resource. Where the path has several segments, the trust level of the path is the lowest trust

level of any of its segments." *Id.* at 6:13-16.

Furthermore, "[m]ethods of encryption also have trust levels. Where the trust level of the path between the user and the access filter is insufficient for the sensitivity level of the resource, the access filter will forward the access request only if the user has encrypted the request with an encryption method whose trust level is sufficient for the sensitivity level. Where the trust level of the path between the access filter and the resource is insufficient, the access filter will automatically encrypt the access request using the minimum encryption method that has a sufficient trust level." *Id.* at 6:29-38.

In a preferred embodiment, "an access request for a[n information resource] will not be forwarded by the access filter unless the trust level of the mode of identification employed by the user and either the trust level of the path taken by the request through the network or the trust level of the encryption method used to encrypt the request are sufficient for the sensitivity level of the resource." *Id.* at 6:38-44.

Figure 2 (below) exemplifies the disclosed invention. Figure 2 depicts a virtual private network (VPN), item 201, "in which access to data is controlled by access filters." *Id.* at 7:59-60.



Fig. 2

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

Virtual private network (item 201) is composed of 4 internal networks (item 103), which are connected to each other by the internet (item 121). *Id.* at 7:62-63. Each internal network has a number of connected user computer systems (item 209) and servers (item 211) which contain data. *Id.* at 7:67-8:4. However, no computer system (item 209) is directly connected to a server; rather, the connection passes through at least one access filter (items 203). *Id.* at 8:4-11. As described above, access to information found on the any of the servers depends on multiple authentication factors and levels. Each user has a mode of identification. Each mode of identification may have a different trust level, which may match the sensitivity level of the information resource the user is trying to request. If the trust level of the mode of identification is insufficient to gain access to an information resource of a particular sensitivity level, then the access filter will not forward along the user's information request. The same idea applies to the trust level of the path and the encryption method used to encrypt the information request. If the trust levels of the path or the encryption method are insufficient to access the information resource of a particular sensitivity level, then the access filter will not pass along the user's information request. If the trust level of the path between the access filter and the information resource is insufficient, then the access filter will "automatically encrypt the access request using the minimum encryption method that has a sufficient trust level." *Id.* at 6:35-38.

Plaintiff asserts that Defendant "directly infringed one or more claims of the '505 Patent." AC at ¶ 52. Defendant's motion to dismiss focuses on claim 1.[2] Claim 1 recites:

1. Apparatus that provides an information resource in response to a request from a user, the request including an identification of the user according to a mode of identification and the apparatus comprising:

access control information including

a sensitivity level associated with the resource and

a trust level associated with the mode of identification; and

---

[2] Plaintiff has not identified any representative claims of the '505 Patent. As discussed below, the Court finds that claim 1 is representative of the '505 Patent.

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

an access checker which permits the apparatus to provide the resource only if the trust level for the mode of identification is sufficient for the sensitivity level of the resource. *Id.* at 49:2-13.

### B. Procedural History

On June 20, 2018, Plaintiff filed the instant patent infringement suit asserting the '399 Patent, the '505 Patent, and U.S. Patent No. 7,567,541. ECF No. 1. On August 13, 2018, Defendant filed a motion to dismiss. ECF No. 24 ("Mot."). On August 27, 2018, Plaintiff filed an opposition. ECF No. 27 ("Opp."). On September 4, 2018, Defendant filed a reply. ECF No. 31 ("Reply").

On October 18, Plaintiff filed a motion to amend the complaint. ECF No. 46. In its motion to amend the complaint, Plaintiff sought to "remove its assertion of U.S. Patent No. 7,567,541 . . . from this lawsuit" because Plaintiff's wholly-owned subsidiary, Orcinus Holdings LLC, was going to assert that patent in another case. *Id.* at 1. Plaintiff also sought to remove its request for injunctive relief. *Id.* The Court granted Plaintiff's motion to amend the complaint. ECF No. 47. Thereafter, on October 22, 2018, Plaintiff filed an amended complaint which only asserts the '399 Patent and the '505 Patent. AC at ¶¶ 7-9. Plaintiff alleges that "Synchronoss's Cloud products, including without limitation its Personal Cloud product, infringes the Patents-in-Suit . . . ." *Id.* at ¶ 15. On November 30, 2018, the Court denied as moot Defendant's motion to dismiss, ECF No. 24, in light of the amended complaint.

On December 3, 2018, Defendant refiled its motion to dismiss, incorporating the briefing from its previous motion to dismiss. ECF No. 57. On December 5, 2018, Plaintiff filed an opposition to Defendant's motion to dismiss, incorporating the briefing from Plaintiff's previous opposition. ECF No. 60. On December 11, 2018, Defendant filed a reply, incorporating the briefing from its previous reply. ECF No. 61. Thus, even though the parties' briefing discusses U.S. Patent No. 7,567,541, this patent is not at issue in the instant motion to dismiss because it is no longer being asserted against Defendant in the instant case.

Also, in the amended complaint, Plaintiff fails to identify any specific claims that are being

asserted against Defendant. *See, e.g.*, AC at ¶ 29 ("Synchronoss directly infringed one or more claims of the '399 Patent . . . ."); *id.* at ¶ 52 ("Synchronoss directly infringed one or more claims of the '505 Patent . . . ."). So, by the time Defendant refiled its motion to dismiss, the amended complaint had not put Defendant on notice as to which specific claim or claims in either the '399 Patent or the '505 Patent Defendant is alleged to have infringed.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'[a] plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

### B.    Motion to Dismiss for Patent Eligibility Challenges Under 35 U.S.C. § 101

Defendant's motion argues that the patents-in-suit fail to claim patent-eligible subject

matter under 35 U.S.C. § 101 in light of the U.S. Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014). The ultimate question whether a claim recites patent-eligible subject matter under § 101 is a question of law. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) ("Patent eligibility under § 101 is an issue of law[.]"); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) (same). However, the Federal Circuit has identified that there are certain factual questions underlying the § 101 analysis. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018). Accordingly, a district court may resolve the issue of patent eligibility under § 101 by way of a motion to dismiss. *See, e.g.*, *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) (affirming determination of ineligibility made on 12(b)(6) motion); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) (same).

Although claim construction is often desirable, and may sometimes be necessary, to resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has explained that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction*, 776 F.3d at 1349; *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 539 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016).

## C.    Substantive Legal Standards Applicable Under 35 U.S.C. § 101

### 1. Patent-Eligible Subject Matter Under 35 U.S.C. § 101

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Id.* (quoting

10

35 U.S.C. § 101). These categories are broad, but they are not limitless. Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (citation omitted). These three categories of subject matter are excepted from patent-eligibility because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (citations omitted). The U.S. Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.* However, the U.S. Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (alteration, internal quotation marks, and citation omitted). Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

In *Alice*, the leading case on patent-eligible subject matter under § 101, the U.S. Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77. *Alice*, 134 S. Ct. at 2355. This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id.* (alterations in original) (citations omitted); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the [U.S.] Supreme Court in *Alice*").

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

**2.** *Alice* **Step One—Identification of Claims Directed to an Abstract Idea**

Neither the U.S. Supreme Court nor the Federal Circuit has set forth a bright-line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework. *See, e.g.*, *Alice*, 134 S. Ct. at 2357 (noting that "[the U.S. Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the U.S. Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice* (citation omitted)). As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Two of the U.S. Supreme Court's leading cases concerning the "abstract idea" exception involved claims held to be abstract because they were drawn to longstanding, fundamental economic practices. *See Alice*, 134 S. Ct. at 2356 (claims "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" were directed to a patent-ineligible abstract idea); *Bilski*, 561 U.S. at 611-12 (claims drawn to "the basic concept of hedging, or protecting against risk" were directed to a patent-ineligible abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class" (citation omitted)).

Similarly, the U.S. Supreme Court has recognized that information itself is intangible. *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n.12 (2007). Accordingly, the Federal Circuit has generally found claims abstract where they are directed to some combination of acquiring information, analyzing information, and/or displaying the results of that analysis. *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-95 (Fed. Cir. 2016) (claims "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected" were drawn to a patent-ineligible abstract idea); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea because

12

"[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions"); *In re TLI Commc'ns LLC*, 823 F.3d at 611 (claims were "directed to the abstract idea of classifying and storing digital images in an organized manner"); *see also Elec. Power Grp.*, 830 F.3d at 1353-54 (collecting cases).

However, the determination of whether other types of computer-implemented claims are abstract has proven more "elusive." *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) ("[P]recision has been elusive in defining an all-purpose boundary between the abstract and the concrete[.]"). As a result, in addition to comparing claims to prior U.S. Supreme Court and Federal Circuit precedents, courts considering computer-implemented inventions have taken varied approaches to determining whether particular claims are directed to an abstract idea.

For example, courts have considered whether the claims "purport to improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, which may suggest that the claims are not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract process, *Enfish*, 822 F.3d at 1336; *see also id.* at 1335 ("[S]ome improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like. Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract[.]"). The Federal Circuit has followed this approach to find claims patent-eligible in several cases. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims directed to an improved memory system were not abstract because they "focus[ed] on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor" (quoting *Enfish*, 822 F.3d at 1336)); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims directed to automating part of a preexisting method for 3-D facial expression animation were not abstract because they "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type");

*Enfish*, 822 F.3d at 1335–36 (claims directed to a specific type of self-referential table in a computer database were not abstract because they focused "on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database)").

Similarly, the Federal Circuit has found that claims directed to a "new and useful technique" for performing a particular task were not abstract. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (holding that "claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform" were not abstract); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048, 1050 (Fed. Cir. 2016) (holding that claims directed to "a new and useful laboratory technique for preserving hepatocytes," a type of liver cell, were not abstract); *see also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (holding that claims for a method to cure rubber that employed a formula to calculate the optimal cure time were not abstract).

Another helpful tool used by courts in the abstract idea inquiry is consideration of whether the claims have an analogy to the brick-and-mortar world, such that they cover a "fundamental . . . practice long prevalent in our system." *Alice*, 134 S. Ct. at 2356; *see, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (finding an email processing software program to be abstract through comparison to a "brick-and-mortar" post office); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized 'brick and mortar' context." (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)).

Courts will also (or alternatively, as the facts require) consider a related question of whether the claims are, in essence, directed to a mental process or a process that could be done with pencil and paper. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1147 (Fed. Cir. 2016) (claims for translating a functional description of a logic circuit into a hardware component description of the logic circuit were patent-ineligible because the "method can be

performed mentally or with pencil and paper"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the Internet was patent-ineligible because the "steps can be performed in the human mind, or by a human using a pen and paper"); *see also, e.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for computer-implemented system to enable borrowers to shop for loan packages anonymously were abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer").[3]

Regardless of the particular analysis that is best suited to the specific facts at issue in a case, however, the Federal Circuit has emphasized that "the first step of the [*Alice*] inquiry is a meaningful one, i.e., . . . a substantial class of claims are *not* directed to a patent-ineligible concept." *Enfish*, 822 F.3d at 1335. The court's task is thus not to determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter," *Internet Patents*, 790 F.3d at 1346.

### 3. *Alice* Step Two—Evaluation of Abstract Claims for an Inventive Concept

A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations— considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Thus, the second step of the *Alice* analysis (the search for an "inventive concept") asks whether the claim contains an element or combination of elements that "ensure[s] that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." 134 S. Ct. at 2355 (citation omitted).

The U.S. Supreme Court has made clear that transforming an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it."

---

[3] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be unthinkingly applied. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans engaged in the same activity long before the invention of computers," and concluding that test was unhelpful where "error correction codes were not conventional activity that humans engaged in before computers").

*Id.* at 2357 (quoting *Mayo*, 566 U.S. at 72). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347-48 (alteration in original) (quoting *Alice*, 134 S. Ct. at 2359); *see also Mortg. Grader*, 811 F.3d at 1324-25 (holding that "generic computer components such as an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement"); *Bancorp Servs.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.").

Likewise, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions. *In re TLI Commc'ns LLC*, 823 F.3d at 613 (citation omitted); *see also id.* (ruling that "telephone unit," "server," "image analysis unit," and "control unit" limitations were insufficient to satisfy *Alice* step two where claims were drawn to abstract idea of classifying and storing digital images in an organized manner). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. This inquiry "goes beyond what was simply known in the prior art." *Id.* at 1369.

In addition, the U.S. Supreme Court explained in *Bilski* that "limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable." 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)); *see also Alice*, 134 S. Ct. at 2358 (same). The Federal Circuit has similarly stated that attempts "to limit the use of the abstract idea to a particular technological environment" are insufficient to render an abstract idea patent-eligible. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal quotation marks and citation omitted); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792

F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").

In addition, a "non-conventional and non-generic arrangement of known, conventional pieces" can amount to an inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). For example, in *BASCOM*, the Federal Circuit addressed a claim for Internet content filtering performed at "a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* Because this "specific location" was different from the location where Internet content filtering was traditionally performed, the Federal Circuit concluded this was a "non-conventional and non-generic arrangement of known, conventional pieces" that provided an inventive concept. *Id.* As another example, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit held that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the invention's distributed architecture." 841 F.3d 1288, 1301 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (Nov. 27, 2017). The use of a "distributed architecture," which stored accounting data information near the source of the information in the disparate networks, transformed the claims into patentable subject matter. *Id.*

### 4. Preemption

In addition to these principles, courts sometimes find it helpful to assess claims against the policy rationale for § 101. The U.S. Supreme Court has recognized that the "concern that undergirds [the] § 101 jurisprudence" is preemption. *Alice*, 134 S. Ct. at 2358. Thus, courts have readily concluded that a claim is not patent-eligible when the claim is so abstract that it preempts "use of [the claimed] approach in all fields" and "would effectively grant a monopoly over an abstract idea." *Bilski*, 561 U.S. at 612. However, the inverse is not true: "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *FairWarning*, 839 F.3d at 1098 (alteration in original) (citation omitted).

### III.    DISCUSSION

United States District Court
Northern District of California

Defendant's motion to dismiss contends that the claims of the patents-in-suit fall within the patent-ineligible "abstract ideas" exception to § 101. The Court applies the *Alice* framework described above to these claims. However, the Court need not individually analyze every claim if certain claims are representative. *See generally Alice*, 134 S. Ct. at 2359-60 (finding claims to be patent-ineligible based on analysis of one representative claim). Here, the parties do not agree on any representative claims. Nevertheless, in the absence of agreed-upon representative claims, the Court need not analyze each and every claim of the patent. *Content Extraction*, 776 F.3d at 1348. A district court may conduct its own analysis and determine which claims are representative if "all the claims are substantially similar and linked to the same abstract idea." *Id.* (internal quotation marks omitted).

First, the Court discusses the representative claims of the '399 Patent, then turns to the substantive *Alice* analysis of the '399 Patent. Second, the court discusses the representative claim of the '505 Patent, then turns to the substantive *Alice* analysis of the '505 Patent.

**A. The '399 Patent**

The Court finds that claims 1, 25, 43, and 46 are representative of the '399 Patent. Each of these claims encapsulates the other claims in the '399 Patent, which are "substantially similar" and "linked to the same . . . idea," per the *Content Extraction* court. 776 F.3d at 1348. The Federal Circuit has also held that if the claims "contain only minor differences in terminology but require performance of the same basic process, . . . they should rise or fall together." *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1368 n.7 (Fed. Cir. 2017).

Claim 1 discloses (1) the creation of an interactive connection, (2) the creation of a data transfer connection, and then (3) generating a single session ID associating the two connections. '399 Patent at 11:58-64. Claim 25 contains the above elements of claim 1, and additionally discloses "a synchronizer which synchronizes the operation of respective connections formed by the file upload connection server and by the interactive connection server." *Id.* at 13:22-24. Claim 46 contains the above elements of claim 1, and additionally discloses the use of a username in connection with data transfer. *Id.* at 14:49-52.

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

Claim 43 of the '399 Patent is directed to (1) uploading data to a server, (2) displaying the data at the remote server, and (3) locally displaying the uploaded data as well as any data not uploaded to the remote server. *Id.* at 14:32-39

Thus, claim 1 is representative of claims directed to generating a single session ID for the interactive connection and the data transfer connection. Claim 25 is representative of claims directed to a synchronizer that synchronizes the operations of the interactive connection and the data transfer connection. Claim 43 is representative of claims directed to displaying local file information, where local data not downloaded from the remote server is displayed. Finally, claim 46 is representative of claims directed to using a username in the upload process. These chosen representative claims (claims 1, 25, 43, 46) comprise the majority of the independent claims of the '399 Patent.

The remaining independent claims (claims 11, 32, and 36) are directed to concepts that are substantially similar to and require performance of the same idea as the representative claims. For instance, independent claim 11 is directed to a "*method of transferring data* between a client and a service provider," which is substantially similar to representative claim 1, which discloses a "method of synchronizing an interactive connection and a non-interactive *data transfer connection* between a client and a service provider." *Id.* at 11:58-60, 12:31-32 (emphasis added). Both claims deal with data transfer connections between a client and a service provider. Additionally, independent claim 32 discloses an "[a]pparatus for uploading data files," which is substantially similar to representative claim 25, which also discloses an "[a]pparatus for uploading data files." *Id.* at 13:19, 45. Both claims disclose a file upload component, an interactive connection component, and a synchronizer. *Id.* at 13:20-25, 46-50. Lastly, independent claim 36 discloses an "apparatus for synchronizing a file upload connection and an interactive connection," which is substantially similar to representative claim 25. *Id.* at 13:63-64. Both claims disclose similar concepts of a file upload connection, an interactive connection, and a synchronizer. *Id.* at 13:20-25, 14:1-12.

Plaintiff points to dependent claims 2, 18, 26, and 41 as disclosing "many other features

19

and details related to the claimed invention" not represented in the chosen representative claims. Opp. at 5. "For example, Claim 2 describes creating the data transfer connection responsive to the interactive connection; Claim 18 describes rejecting connections to a user name that are not from a particular identified client; Claim 26 describes generating a single session ID associated with each of the connections; and Claim 41 describes using two synchronizers in communication allowing further control over file uploading." *Id.* at 5-6. However, the Court disagrees with Plaintiff.

Claim 2 depends from representative claim 1, and merely discloses that the data transfer connection is created responsive to the interactive connection. '399 Patent at 11:65-67. Claim 2 and representative claim 1 "require performance of the same basic process" of data transfer via the data transfer connection; claim 2 appends nothing more than a temporal ordering to which the data transfer connections are created, which does not defeat the basic idea that the two claims are directed to the same idea. *Smart Sys. Innovations*, 873 F.3d at 1368 n.7.

Claim 18, like representative claim 46, discloses the idea of the use of a username. '399 Patent at 12:64-67. The use of a username to gain access to an information resource in both claim 18 and representative claim 46 share the same underlying concept and perform the same basic process because the '399 Patent discloses that the "synchronizer generates a username for use of said file upload connection." *Id.* at 5:12-13. Both claim 18 and claim 46 disclose the use of a username in connection with data transfer; thus, claim 46 encapsulates the idea of the use of a username in data transfer, which is exactly what claim 18 discloses.

Claim 26, like representative claim 1, discloses the use of a single session ID in connection with data transfer, so both claims require performance of the same basic process of assigning an identificatory label to the data transfer process. *Id.* at 13:26-28.

Lastly, claim 41 discloses the use of an additional synchronizer in the data transfer process. *Id.* at 14:25-28. However, representative claim 25 is directed to the same idea as claim 41 because claim 25 already discloses the use of a synchronizer. Adding an additional synchronizer, as claim 41 does, fails to transmute claim 41 into disclosing a fundamentally different idea than representative claim 25 because the additional synchronizer of claim 41 is also involved in the

20

data transfer process, thus performing the same basic process as the synchronizer of representative claim 25.

In sum, claims 1, 25, 43, and 46 are representative of the '399 Patent.

Below, the Court conducts the *Alice* analysis for claims 1, 25, and 46 of the '399 Patent together. Then, the Court separately conducts the *Alice* analysis for claim 43 of the '399 Patent. Lastly, the Court discusses whether there are open factual disputes that prevent the Court from finding the '399 Patent invalid based on the pleadings.

### 1. *Alice* Step One for Claims 1, 25, and 46 of the '399 Patent—Whether the Claims are Directed to an Abstract Idea

Defendant argues that the '399 Patent is directed toward the abstract idea of "synchronizing data connections." Mot. at 18. Specifically, because the only physical components recited are generic, the '399 Patent is directed toward an abstract idea because the patent "merely attempts to accomplish known and conventional computer methods in a way that is 'more user friendly.'" *Id.* at 19. Plaintiff responds by arguing that the '399 Patent is not directed toward an abstract idea because it is addressing a problem specifically arising in 1997 computer technology, and the claims "also lack any brick-and-mortar analogy." Opp. at 6.

Step one of the *Alice* framework directs the Court to assess "whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. The step one inquiry "applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335 (citation omitted). Thus, the Court conducts its step one inquiry by first identifying what the "character as a whole" of claims 1, 25, and 46 of the '399 Patent is "directed to," and then discussing whether this is an abstract idea. In distilling the character of a claim, the Court is careful not to express the claim's focus at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. *Enfish*, 822 F.3d at 1337; *see also Thales Visionix*, 850 F.3d at 1347 ("We must therefore ensure at step one that we articulate what the claims are directed to with enough

21

specificity to ensure the step one inquiry is meaningful.").

The Court finds that claim 1 of the '399 Patent is directed to the abstract idea of exchanging data using a computer. Claim 1 is simple. It discloses (1) the creation of an interactive connection, (2) the creation of a data transfer connection, and then (3) generating a single session ID associating the two connections. '399 Patent at 11:58-64. Thus, claim 1 boils down to starting two types of data connections, and then assigning a label (i.e., a session ID) to the data connections. Similarly, claim 25 tacks onto the concepts disclosed in claim 1 an additional limitation wherein the exchange of data is synchronized. Additionally, claim 46 adds to the concepts disclosed in claim 1 the idea of exchanging data with the use of a username. The Court finds that claims 1, 25, and 46 are all directed toward abstract ideas. The Court discusses each claim in turn.

a. Claim 1

In claim 1, the claim and specification are not directed to a specific improvement to computer functionality. As aforementioned, claim 1 discloses (1) the creation of an interactive connection, (2) the creation of a data transfer connection, and then (3) generating a single session ID associating the two connections. '399 Patent at 11:58-64. Exemplified in claim 1 (and also common to claims 25 and 46, also discussed in this section) are the interactive connection and the data transfer connection. The claims and specification describe in very broad, functional terms the creation of these two types of data connections between a client and a service provider. *See, e.g.*, *id.* at 1:43-45 (specifying that the goal of the invention is to "provide a method of uploading large amounts of data [from a client] to a service provider"); *id.* at 1:60-63 ("[T]he software package preferably creates two sessions, an interactive session, such as one based on a WWW protocol and a file upload session . . . .").

The Federal Circuit has recognized that "[g]eneralized steps to be performed on a computer using conventional computer activity are abstract . . . ." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal quotation marks omitted). For instance, the Federal Circuit found that a patent claim for taking digital images using a telephone, storing

the images, then transmitting the images to a server which receives the images failed step one of *Alice*. *TLI Comm'cns*, 823 F.3d at 610, 612. In explaining why the patent claim failed step one of *Alice*, the *TLI* court wrote:

> Contrary to TLI's arguments on appeal, the claims here are not directed to a specific improvement to computer functionality. Rather, they are directed to the use of conventional or generic technology in a nascent but well-known environment . . . . The specification does not describe a new telephone, a new server, or a new physical combination of the two. The specification fails to provide any technical details for the tangible components, but instead predominantly describes the system and methods in purely functional terms. For example, the "telephone unit" of the claims is described as having "the standard features of a telephone unit" . . . . Likewise, the server is described simply in terms of performing generic computer functions such as storing, receiving, and extracting data.

*Id.* In essence, the *TLI* court found that because the *TLI* patent's specification failed to provide technical details for the components, but instead described the system and methods "in purely functional terms," functions that were generic to a computer, the *TLI* patent claim failed step one of *Alice*. *Id.*

The '399 Patent's specification concedes that the interactive connection and the data transfer connection are known in the art as conventional computer activity. Specifically, the specification makes clear that the Patent did not invent either the interactive connection or the data transfer connection. *See, e.g.*, '399 Patent at 3:32-34 ("Preferably, the service provider includes a *WWW server*, for the interactive session and an *FTP server* for the file upload session."); *id.* at 6:61-64 ("The interactive connection is made between WWW client 14, which is preferably a *standard browser* and WWW server 20 which is preferably a *commercially available WWW server*."); *id.* at 7:28-29 ("In a preferred embodiment of the invention, FTP client 14 and FTP server 18 are *standard commercial FTP programs*.") (emphasis added). Thus, the "interactive connection" and "data transfer connection" are generic computer functions related to receiving and transmitting data. Therefore, the creation of the interactive connection and the data transfer connection are akin to the patent in *TLI*. The '399 Patent's disclosure of the interactive connection and the data transfer connection constitute the performance of generic computer functions such as

23

1  transmitting and receiving data. As *TLI* held, "performing generic computer functions such as

2  storing, receiving, and extracting data" is abstract. 823 F.3d at 612.

3      In claim 1 of the '399 Patent, there is an additional claim element wherein a single session

4  ID is generated for the interactive connection and the data transfer connection. However, a single

5  session ID is simply a label by which the connections are identified. Applying an identificatory

6  label to the generic exchange of data via the interactive connection and the data transfer

7  connection is hardly a specific improvement on computer functionality or a nongeneralized

8  computer activity. Per the *Content Extraction* court, "[t]he concept of data collection, *recognition*,

9  and storage is undisputedly well-known." 776 F.3d at 1347 (emphasis added). Thus, the well-

10  known and abstract concept of data recognition is embodied by assigning a session ID to the data

11  connections, because the session ID—as its name suggests—identifies the data connections that

12  are created.

13      Plaintiff cites to *DDR Holdings*, a case Plaintiff claims is analogous, for the proposition

14  that "claims directed to website usability and functionality 'rooted in computer technology'" are

15  not directed to an abstract idea. Opp. at 6 (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773

16  F.3d at 1257-59). However, *DDR Holdings* is distinguishable from the instant case because the

17  *DDR Holdings* patent claims "specify how interactions with the Internet are manipulated to yield a

18  desired result—a result that overrides the routine and conventional sequence of events ordinarily

19  triggered by the click of a hyperlink." *DDR Holdings*, 773 F.3d at 1258. Here, we have the

20  situation where generic aspects of computing—transmitting and receiving data—are performed

21  using generic elements of data transfer via the internet—a WWW server and an FTP server.

22  Neither the '399 Patent specification nor claims provide any additional details on how interactions

23  with the internet are manipulated to yield a desired result, like in *DDR Holdings*. Thus, the '399

24  Patent is much more analogous to the patent in *TLI*, in which computer systems and methods were

25  described and implemented in purely generic terms. *See, e.g.*, '399 Patent at 11:60-61 (claiming

26  the process of "creating an interactive connection" and "creating a data transfer connection").

27  Thus, claim 1 is directed to an abstract idea.

28

United States District Court
Northern District of California

b.   Claim 25

In claim 25 of the Patent, in addition to the file upload server and an interactive connection server (already discussed above in relation to claim 1), there is the additional claim element of a synchronizer which synchronizes the interactive connection server and the file upload connection server. But like in claim 1, synchronizing the operations of the interactive connection and the file upload connection does not rise to the level of nongeneralized computer activity. Specifically, according to the specification, the synchronizer "generates a single session ID for two associated sessions, each on a different one of said servers." *Id.* at 4:34-36. As such, the synchronizer is involved in the process of identifying the data exchanged which, as discussed with regard to claim 1, is directed to an abstract idea involving the recognition of data. *See Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, *recognition*, and storage is undisputedly well-known" (emphasis added).).

c.   Claim 46

In claim 46 of the Patent, in addition to the file upload server and an interactive connection server (already discussed above in relation to claim 1), there is the additional claim element of using a username during the data exchange. Usernames are common and generic. In *Williamson v. Citrix Online, LLC*, 212 F. Supp. 3d 887, 906 (C.D. Cal. 2016), *aff'd*, 683 Fed. App'x 956 (Fed. Cir. 2017), the court described the use of a username to authenticate a user in the context of data streaming as "conventional." Again, as discussed above, the addition of a username as an additional method to mark or label the exchanged data does not remedy the problem of the claim being directed to an abstract idea.

Therefore, the Court finds that claims 1, 25, and 46 of the '399 Patent are directed toward abstract ideas.

## 2.   *Alice* Step Two for Claims 1, 25, and 46 of the '399 Patent—Whether the Claims Contain an Inventive Concept

Defendant argues that the '399 Patent does not contain an inventive concept because the Patent is "so result-based that it amounts to nothing more than patenting the abstract concept itself." Mot. at 19. In particular, Defendant argues that the claimed servers are generic, standard

25

commercial products and the claimed synchronizer "offers no algorithm or function that describes how it synchronizes the claimed server connections." *Id.* at 20. Plaintiff argues that at the time the '399 Patent was filed, uploading to a server was quite a difficult feat. Opp. at 8. Plaintiff asserts that the '399 Patent solved the problem of uploading significant amounts of data "through a novel and unconventional combination of features unlike anything seen before." *Id.*

"In step two of the *Alice* inquiry, [the Court] search[es] for an 'inventive concept sufficient to transform the nature of the claim into a patent-eligible application." *RecogniCorp*, 855 F.3d at 1327 (quoting *McRO*, 837 F.3d at 1312) (internal quotation marks omitted)). "To save the patent at step two, an inventive concept must be evident in the claims." *Id.* This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349; "must be more than well-understood, routine, conventional activity," *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016); "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355. "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

The Court finds that none of the claims' elements, assessed individually, provide an inventive concept. The interactive connection and the data transfer connection are generic computer-related concepts as they literally are just data transfer modalities. As mentioned above, the specification confirms that the '399 Patent did not invent either the interactive connection or the data transfer connection. *See id.* at 1:60-64 ("[T]he software package preferably creates two sessions, an interactive session, such as one based on a WWW protocol and a file upload session . . . ."); *id.* at 3:32-34 ("Preferably, the service provider includes a WWW server, for the interactive session and an FTP server for the file upload session."); *id.* at 5:16-18 ("Alternatively or additionally, said file upload server is a FTP server. Alternatively or additionally, said interactive

connection server is a WWW server."); *id.* at 6:61-64 ("The interactive connection is made between WWW client 14, which is preferably a standard browser and WWW server 20 which is preferably a commercially available WWW server."); *id.* at 7:28-29 ("In a preferred embodiment of the invention, FTP client 14 and FTP server 18 are standard commercial FTP programs."). Thus, the "interactive connection" and "data transfer connection" are conventional and well-understood techniques as computers have long performed the process of transferring data, even according to the '399 Patent's own specification.

Moreover, as *Content Extraction* held, "[t]he concept of data collection, *recognition*, and storage is undisputedly well-known." 776 F.3d at 1347 (emphasis added). Claims 1, 25, and 46 are all directed to forms of further identifying the data or the data transfer process.

For instance, claim 1 associates a session ID with the interactive connection and the data transfer connection. This is an example of data recognition because the session ID is a form of identification that is associated with the interactive connection and the data transfer connection.

Additionally, claim 25 discloses a synchronizer, which, as explained above, "generates a single session ID for two associated sessions, each on a different one of said servers." '399 Patent at 4:34-36. Using the same logic as applied to claim 1, the synchronizer is a tool by which the data or data transfer process can be further identified. Furthermore, claim 25 discloses servers, which are generic as they are described functionally as the "interactive connection server" and the "file upload connection server." *Id.* at 13:20-21.

Furthermore, claim 46 discloses using a username in the data transfer process. As aforementioned, the use of usernames is common and generic. *Williamson*, 212 F. Supp. 3d at 906 (describing the use of a username to authenticate a user in the context of data streaming as "conventional").

Finally, the ordered combination of these elements also does not yield an inventive concept. In *BASCOM*, the Federal Circuit held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." 827 F.3d at 1350. Here, however, claim 1 follows a conventional process of creating a data transfer protocol wherein

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

connections are established between two computers or servers, and the connection is identified by a session ID. For example, the court in *BuySAFE* held that the fact that "a computer receives and sends the information over a network—with no further specification—is not even arguably inventive." 765 F.3d at 1355. Likewise, claim 25 is merely an extension of claim 1, adding a synchronizer that can generate one session ID for two associated sessions. As aforementioned, according to the *Content Extraction* court, identification of data, such as through assignment of a session ID, can hardly be considered inventive enough to transform an abstract idea into a patentable one. 776 F.3d at 1347. Claim 46 also follows a conventional process of associating a username with the transfer of information between servers. *See, e.g.*, *Williamson*, 212 F. Supp. 3d at 906 (describing the use of a username to authenticate a user in the context of data streaming as "conventional").

Therefore, claims 1, 25, and 46 of the '399 Patent do not contain an inventive concept.

### 3. *Alice* Step One for Claim 43 of the '399 Patent—Whether the Claim is Directed to an Abstract Idea

Claim 43 of the '399 Patent is directed to (1) uploading data to a server, (2) displaying the data at the remote server, and (3) locally displaying the uploaded data as well as any data not uploaded to the remote server. '399 Patent at 14:32-39. The claim discloses a generic server and a generic local data display. Specifically, a "list of file information" for multiple local files is uploaded to a remote server, where a data display is generated. *Id.* at 14:32-35. The data is also displayed locally, and additionally includes a display of data "not downloaded from the remote server, responsive to said local file information." *Id.* at 14:36-39. However, the claim and specification do not provide any limiting rules or algorithms that describe how the local file information display performs these functions. The Court finds that claim 43 is thus directed to the abstract idea of uploading, processing, and displaying information.

Specifically, in *Electric Power Group*, the Federal Circuit stated that "collecting information, including when limited to particular content (which does not change its character as information), [i]s within the realm of abstract ideas." 830 F.3d at 1353. In addition, the Federal

Circuit has treated "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Id.* at 1354. The Federal Circuit held in *Electric Power Group* that claims for "a process of gathering and analyzing information of a specified content, then displaying the results," which did not use "any particular assertedly inventive technology for performing those functions," were directed to an abstract idea. *Id.* Similarly, in *West View Research, LLC v. Audi AG*, 685 F. App'x 923, 926 (Fed. Cir. 2017), the Federal Circuit held that claims that "do not go beyond receiving or collecting data queries, analyzing the data query, retrieving and processing the information constituting a response to the initial data query, and generating a visual or audio response to the initial data query" were directed to the abstract idea of collecting and analyzing information.

Here, the remote server is configured to collect information. '399 Patent at 14:34-35. This amounts to nothing more than gathering data, which is an abstract idea. *See Elec. Power Grp.*, 830 F.3d at 1353. Then, presumably undergoing some sort of data analysis, a data display is generated at the remote server. '399 Patent at 14:36. Without specifying what particular rules or types of rules are applied in generating this data display, the claim describes nothing more than generic data analysis. Then, the same data is displayed locally. *Id.* at 14:37. The local data display also includes unspecified "local data not downloaded from the remote server." *Id.* at 14:37-39. Similarly, the Federal Circuit has held that displaying the results of collecting and analyzing information, without more, "is abstract as an ancillary part of such collection and analysis." *Elec. Power Grp.*, 830 F.3d at 1354; *see also W. View Research*, 685 F. App'x at 926 (holding claim that included generating a visual or audio response to a data query is directed to the abstract idea of collecting, analyzing, and displaying information).

Accordingly, the Court finds that claim 43 is directed to an abstract idea. The Court next analyzes *Alice* step two.

### 4. *Alice* Step Two for Claim 43 of the '399 Patent—Whether the Claim Contains an Inventive Concept

The Court finds that none of the claim elements, assessed individually, provide an

inventive concept. The remote server, remote data display, and local data display are, in broad

terms, generic, conventional components. The specification confirms these are generic

components, as the specification adds no more specificity as to the remote server or local data

display. *See, e.g.*, '399 Patent at 5:26-34 ("There is also provided in accordance with a preferred

embodiment of the invention, a method of local file information display, comprising: uploading a

list or fle [sic] information for a plurality of local files to a remote server; generating a data display

at the remote server; and locally displaying said data display . . . ."). In essence, the specification

unhelpfully regurgitates the claim language. The claim calls on these generic components to

perform their routine functions.

The servers are generic servers available commercially. *Id.* at 3:35-36 ("Preferably, both

servers are standard commercial software products . . . ."); *see also TLI*, 823 F.3d at 613 ("We

agree with the district court that the claims' recitation of . . . a 'server' . . . fail[s] to add an

inventive concept sufficient to bring the abstract idea into the realm of patentability.").

The data displays do exactly what their names suggest: display data. Nothing about the

claim or specification suggests that the way this method is accomplished is anything but generic—

as explained above, the claims recite this method only functionally and require no inventive

algorithm or data structure for performing them. *See DIRECTV*, 838 F.3d at 1262 (finding no

inventive concept where "[t]he claim simply recites the use of generic features of cellular

telephones, such as a storage medium and a *graphical user interface*, as well as routine functions,

such as transmitting and receiving signals, to implement the underlying idea" (emphasis added).).

Finally, the ordered combination of these elements also does not yield an inventive

concept. Claim 43 follows a conventional order. Data is uploaded, processed, then displayed. The

Federal Circuit's analysis of the claim in *TDE Petroleum Data Solutions, Inc. v. AKM Enterprise,*

*Inc.*, 657 F. App'x 991 (Fed. Cir. 2016), is instructive. The claim in *TDE Petroleum* was drawn to

an "automated method for determining the state of a well operation" that involved receiving

signals from the well, validating the signals, and automatically selecting a state of the well

operation. *Id.* at 992.

30

In essence, the *TDE Petroleum* claim discloses *uploading* data from the well, *processing* the data by validating the data, then doing something with the data post-processing. After holding at step one that the claim was directed to the abstract idea of data collection and processing, the Federal Circuit held at step two that nothing in the claim brought the claim out of the realm of the abstract idea. *Id.* at 993. Specifically, the Federal Circuit wrote that any argument that there was an inventive concept in the ordered combination of the claim's steps "would be unpersuasive given that they are the most ordinary of steps in data analysis and are recited in the ordinary order." *Id.* Here, claim 43 is analogous to the *TDE Petroleum* claim because data is being uploaded, processed, then displayed post-processing. Though the *TDE Petroleum* claim does not require the data to be displayed post-processing, the Federal Circuit has found that displaying data on a generic computer after data analysis does not meet step two of *Alice. Univ. of Florida Research Found., Inc. v. Gen. Elec. Co.*, __F.3d__, 2019 WL 921859, at *5 (Fed. Cir. Feb. 26, 2019) (finding invalid the abstract idea of "collecting, analyzing, manipulating, and displaying data"). Accordingly, the Court finds that nothing in the ordered combination of elements recited in claim 43 bring it outside the realm of the abstract idea of uploading, processing, and displaying data. Thus, claim 43 lacks an inventive concept.

### 5. Whether There Exist Open Factual Disputes That Preclude Dismissal on the Pleadings

Plaintiff points to attorney argument found in the amended complaint to argue that the amended complaint raises fact questions that cannot be resolved on a Rule 12 motion. Opp. at 10. For instance, one of the alleged fact questions raised in Plaintiff's opposition, which Plaintiff quotes from the amended complaint, is as follows: "[t]hese claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional." *Id.* (quoting AC at ¶ 29). In general, the 5 paragraphs of the amended complaint to which Plaintiff cites in Plaintiff's opposition generally describe how the '399 Patent is an advancement over the prior art. Opp. at 10. However, there are no factual allegations or references to the '399 Patent specification that undergird Plaintiff's purported fact

31

United States District Court
Northern District of California

1    questions cited in Plaintiff's opposition.

2          Under Federal Circuit law, "[w]hether a claim recites patent eligible subject matter is a

3    question of law which . . . has in many cases been resolved on motions to dismiss or summary

4    judgment." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). "As our cases

5    demonstrate, not every § 101 determination contains genuine disputes over the underlying facts

6    material to the § 101 inquiry." *Id.*

7          In *Uniloc USA, Inc. v. Apple Inc.*, the court found the patent at issue invalid even though

8    the plaintiff insisted there were factual disputes precluding judgment on the pleadings. 2018 WL

9    2287675, at *7 (N.D. Cal. May 18, 2018). The *Uniloc* court rejected plaintiff's contentions that the

10   claimed invention did not feature "routine and conventional elements like hardware

11   configurations." *Id.* (internal quotations omitted). The *Uniloc* court reasoned that the plaintiff was

12   attempting to "manufacture a factual question" by relying on attorney arguments. *Id.* Here, the

13   situation is analogous to that in *Uniloc*. Plaintiff can merely point to attorney argument found in

14   the amended complaint as grounds for why claimed elements are not routine or conventional.

15   Thus, per the *Uniloc* court, Plaintiff's attorney arguments in the amended complaint do not create

16   a factual dispute precluding disposition of the instant case on a Rule 12 motion.

17         Likewise, the *Cellspin Soft, Inc. v. Fitbit, Inc.* court found that the plaintiff did not create a

18   factual dispute in a § 101 motion for judgment on the pleadings because the plaintiff "fail[ed] to

19   identify any portion of the specification which describes the purportedly inventive" concept. 316

20   F. Supp. 3d 1138, 1154 n.12 (N.D. Cal. 2018). Here, Plaintiff's brief has also failed to identify any

21   portion of the specification that would transform ideas in the '399 Patent—such as the interactive

22   connection, data transfer connection, synchronizer, and session ID—into non-generic, inventive

23   concepts. As the Court found above, all such ideas found in the Patent are generic. Therefore, no

24   factual dispute exists that would preclude this Court from finding the '399 Patent invalid based on

25   a Rule 12 motion.

26         Because the Court finds at *Alice* step one that the '399 claims are directed to an abstract

27   idea and at step two that there is no inventive concept sufficient to save the claims, the Court

28

concludes that the '399 claims are patent-ineligible under § 101. Defendant's motion to dismiss the '399 Patent claims is therefore GRANTED.

## B. The '505 Patent

Defendant's motion to dismiss contends that the claims of the '505 Patent fall within the patent-ineligible "abstract ideas" exception to § 101. The Court applies the *Alice* framework described above to these claims. However, the Court need not individually analyze every claim if certain claims are representative. *See generally Alice*, 134 S. Ct. at 2359-60 (finding claims to be patent-ineligible based on analysis of one representative claim).

Here, the Court finds that claim 1 is representative of all the claims of the '505 Patent. Claim 16, the only other independent claim in the '505 Patent, is substantially similar to claim 1. Claim 1 discloses an "[a]pparatus that provides an information resource in response to a request from a user, the request including an identification of the user according to a mode of identification." '505 Patent at 49:2-5. Similarly, claim 16 discloses an "[a]pparatus that provides an information resource via a path through a network to a user in response to a request from the user." *Id.* at 50:31-33. All the claims are substantially similar in that they are apparatus claims for a device providing data security associated with a user in response to a request for data from the user. Furthermore, they are all linked to the same idea of data security.

Plaintiff argues that claim 1 is not representative because other claims, such as dependent claims 3, 4, and 8 disclose other details about the invention. For instance, claim 3 "describes potential implementation details," claim 4 "describes what may happen if the trust level associated with a user is insufficient," and claim 8 "describes how path trust level and encryption trust level may also be used in an overall trust level determination." Opp. at 11.

The Federal Circuit has held that if the claims "contain only minor differences in terminology but require performance of the same basic process, . . . they should rise or fall together." *Smart Sys. Innovations, LLC*, 873 F.3d at 1368 n.7. The *Content Extraction* court has held that if claims are "substantially similar" and "linked to the same . . . idea," then they also rise or fall together. 776 F.3d at 1348. Here, claim 1 encompasses claims 3, 4, and 8 because all four

33

claims require the basic performance of the same basic process, i.e., providing access to an information resource depending on preset security requirements. There is nothing disclosed in claims 3, 4, and 8 that is not already represented in claim 1.

Claim 1 discloses "a sensitivity level associated with the [data] resource," a "trust level associated with the mode of identification [of a user]," and an "access checker which permits the apparatus to provide the [data] resource only if the trust level for the mode of identification is sufficient for the sensitivity level of the resource." '505 Patent at 49:7-12. Claim 3 merely elaborates slightly on the different modes of identification of a user, which is already embodied in claim 1, which discloses a "trust level associated with the mode of identification [of a user]." *Id.* at 49:8. Claim 4 requires performance of the same basic process as claim 1 by disclosing that the access checker may also restrict access to the data resource based on "a plurality of modes of identification." *Id.* at 49:24-25. Claim 8 similarly requires performance of the same basic process and is linked to the same idea as claim 1 because claim 8 discloses the access checker restricting access to the data resource based on the path the resource takes through the network. Claim 8 is encapsulated in claim 1's requirement that the access checker allow access to a data resource only if prerequisite security levels are met. Thus, claim 1 is representative of the '505 Patent.

Below, the Court conducts the *Alice* analysis for claim 1 of the '505 Patent. Then, the Court discusses whether there are open factual disputes that prevent the Court from finding the '505 Patent invalid based on the pleadings.

### 1. *Alice* Step One for Claim 1 of the '505 Patent—Whether the Claim is Directed to an Abstract Idea

Defendant asserts that claim 1 of the '505 Patent is "directed to the abstract concept of maintaining data security. It recites no concrete components, whether generic or not." Mot. at 21. Defendant gives the example of the U.S. government controlling access to information by "setting different levels of access control (e.g., Secret and Top Secret clearances), and then only allowing access to data set to [a] certain permission level based on the clearance of a person desiring access." *Id.*

Plaintiff counters that the '505 Patent's claims "recite a technical solution (*i.e.*, tailoring authentication and encryption depending on the path taken through the network and the requested resource) to overcome a problem specifically arising in 1997 computer technology." Opp. at 12. Plaintiff further notes that the subject matter of the '505 Patent cannot be performed by a human mentally or via pencil and paper. "No human mind could determine the path taken by a request for information or the mode of information used to determine the source of such a request." *Id.* Lastly, Plaintiff asserts that Defendant has oversimplified the '505 Patent so broadly that it ignores the features recited by the claims. *Id.* at 13.

In reply, Defendant argues that the '505 Patent is not directed to solving an issue unique to the world of computing. Reply at 8. Rather, "[c]laim 1 of the '505 Patent is likewise directed to control of access of information. There is nothing in the claim that indicates it is either a technological solution, or that it solves a uniquely technological problem." *Id.*

The Court finds that claim 1 of the '505 Patent is directed to (1) associating a security level with a data resource, (2) associating a security level with a mode of identification of a user, and then (3) ensuring that the user's security level is sufficiently high to meet the security level of the data resource to access the data resource. '505 Patent at 49:2-12. According to the specification, "an access request for a[n information resource] will not be forwarded by the access filter unless the trust level of the mode of identification employed by the user . . . [is] sufficient for the sensitivity level of the resource." *Id.* at 6:38-44. However, the claim does not provide any limits that curb how the apparatus performs these functions. Thus, the Court finds that claim 1 is directed to an abstract idea. The claim here invokes computers merely as tools to execute fundamental data access control principles.

The Court finds that claim 1 falls squarely within the category of controlling access to data, which the Federal Circuit has found to be an abstract idea. Specifically, the Federal Circuit has held as abstract the idea of "controlling access to data based on payment." *Smartflash LLC v. Apple Inc.*, 680 Fed. App'x 977, 982 (Fed. Cir. 2017). In particular, the claims at issue in *Smartflash* "all purport to retrieve and provide this data subject to 'payment validation' and

35

‘access/use rule[s]’ that specify conditions for accessing/using the retrieved data." *Id.* Although here, the access to data is not controlled based on payment like in *Smartflash*, the case is still analogous. Making payment, like the trust level of a user, is a threshold that must be met in order to gain access to the requested data. Here, if a user has an inadequate trust level, much like if the amount of payment were insufficient, access to the requested data would be blocked. *See, e.g.*, '505 Patent at 6:38-44 ("[A]n access request for a resource will not be forwarded by the access filter unless the trust level of the mode of identification employed by the user . . . [is] sufficient for the sensitivity level of the resource."). Moreover, claim 1 of the '505 patent certainly implements "access/use rules," much like the *Smartflash* patent, in controlling access to data. 680 Fed. App'x at 982; *see, e.g.*, '505 Patent at 5:66-6:3 ("The aspect of making access filters scalable which is addressed by the claims attached hereto is that of providing only as much authentication and encryption security as is required for a given user, a given path through the network, and a given resource.").

In a similar vein, the District of Delaware found that a patent controlling access to data was directed to an abstract idea. Circuit Judge Bryson of the Court of Appeals for the Federal Circuit, sitting by designation on the District of Delaware, summarized the claim at issue as follows: "[a] method entailing storing a customer's identity and the list of items as to which that customer has access rights and, when the customer requests one of the items for which the customer has access rights, obtaining that item from the source and sending it to the customer." *British Telecomms. plc v. IAC/InterActiveCorp*, 2019 WL 438335, at *17 (D. Del. Feb. 4, 2019). The *British Telecomms.* court found that this concept "fits squarely within the category of fundamental economic and conventional business practices[] that the Federal Circuit has repeatedly held to be abstract ideas." *Id.* (internal citation and quotation marks omitted). Like in the '505 Patent, the *British Telecomms.* patent assigns a security level to the user and a security level to the item the customer is requesting. Here, access to a data resource depends on the security level of the user, much like how in *British Telecomms.*, a customer can only obtain an item from the source depending on if the customer is requesting an item to which the customer has access rights. *Id.* The *British*

36

*Telecomms.* court found a plethora of real-world analogues to this claimed process of assigning security levels to a user and a data resource, then controlling access to the data resource based on the user's security level: "Many examples come to mind, such as . . . a college record-keeping system that provides different degrees of access to a student's records depending on whether the record requester is the student, an administrator, a professor, or a healthcare professional affiliated with the college." *Id.*

Therefore, claim 1 of the '505 Patent is directed to an abstract idea.

### 2. *Alice* Step Two for Claim 1 of the '505 Patent—Whether the Claim Contains an Inventive Concept

Defendant argues that the '505 Patent acknowledges that access filters were generic components well-known in the prior art. Thus, there is "nothing unconventional to render abstract ideas claimed in the '505 Patent patentable." Mot. at 21-22. Plaintiff responds by arguing that the Defendant has failed to provide any evidence that the "specific elements of the '505 Patent were well-understood, routine, or conventional at the time of [Plaintiff's] patent." Opp. at 14.

"In step two of the *Alice* inquiry, [the Court] search[es] for an 'inventive concept sufficient to transform the nature of the claim into a patent-eligible application." *RecogniCorp*, 855 F.3d at 1327 (quoting *McRO*, 837 F.3d at 1312) (internal quotation marks omitted)). "To save the patent at step two, an inventive concept must be evident in the claims." *Id.* This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349; "must be more than well-understood, routine, conventional activity," *Affinity Labs of Texas, LLC*, 838 F.3d at 1262; "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355. "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC*, 899 F.3d at 1290-91.

37

The Court agrees with the Defendant that there is no inventive concept to transform the abstract idea into a patentable one. The patent merely claims generic components relating to computer security. Moreover, the patent discloses well-understood, routine, conventional activity.

Claim 1 is directed to (1) associating a security level with a data resource, (2) associating a security level with a mode of identification of a user, and then (3) ensuring that the user's security level is sufficiently high to meet the security level of the data resource to access the data resource. '505 Patent at 49:2-12. As aforementioned, claim 1 merely recites a "sensitivity level" associated with the data resource, a "trust level" associated with the mode of identification" of a user, and an "access checker which permits the apparatus to provide the resource only if the trust level for the mode of identification is sufficient for the sensitivity level of the resource." *Id.*

The Court finds that none of the elements of claim 1 (a "sensitivity level," a "trust level," and an "access checker"), assessed individually, provide an inventive concept. The '505 Patent specification discloses that a "sensitivity level" and a "trust level" are merely generic concepts in data security: "[w]hen a user makes a request to access an information item, the access filter will grant the access only if the *trust level* for the mode of identification that the user employs in the request is no lower than the *sensitivity level* of the resource." *Id.* at 6:13-16 (emphasis added); *see also id.* at 9:30-33 ("The sensitivity level of a resource is simply a value that indicates the trust level required to access the resource. In general, the greater the need to protect the information resource, the higher its sensitivity level."); *id.* at 18:27-32 ("The data sensitivity level indicates the level of secrecy associated with the information resource and is assigned to the information resource by the security administrator responsible for the resource. An exemplary set of levels is Top Secret, Secret, Private, and Public.").

The '505 Patent specification does not explicitly define "access checker," but rather, describes "access filters." The Court finds that an access checker is the same as an access filter, as both things restrict access to the data resource based on the security level of the mode of identification of the user. *Compare id.* at 49:10-13 (claiming "an access checker which permits the apparatus to provide the resource only if the trust level for the mode of identification is sufficient

38

for the sensitivity level of the resource") *with id.* at 2:55-60 (defining "access filter" as "a set of software and hardware components in the computer system which checks all requests from outside the internal network for information stored inside the internal network and only sends a request on into the internal network if it is from a sources [sic] that has the right to access the information"). Moreover, Defendant's motion equates an access filter with an access checker, Mot. at 21, an assertion that Plaintiff does not challenge, Opp. at 13-15.

In addition, access filters, as the above definition from the Patent specification discloses, are also generic computer components. Claim 1 describes access filters in purely functional terms; claim 1 fails to describe *how* the access filter accomplishes the goal of restricting access based on the security level of the mode of identification of the user. The specification sheds no additional light, as it describes access filters in very vague terms as "a set of software and hardware components in the computer system." '505 Patent at 2:55-56. Thus, none of the elements of claim 1, assessed individually, transform the abstract idea into a patent-eligible concept as they are the "application of an abstract idea using conventional and well-understood techniques" *BSG Tech LLC*, 899 F.3d at 1290.

Finally, the ordered combination of the elements of claim 1 also does not yield an inventive concept. In *BASCOM*, the Federal Circuit held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." 827 F.3d at 1350. Here, however, claim 1 follows a conventional order of how an access checker (i.e., access filter) serves as a gatekeeper to a data resource. Claim 1 claims a set of preset rules (i.e., a trust level of the mode of identification of a user and a sensitivity level of an information resource), rules that the access checker applies to grant or deny access to an information resource. '505 Patent at 49:2-12.

In *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, the Federal Circuit found a claim reciting "allowing an *authorized user* to edit and perform the determined task" to be patent ineligible. 728 F.3d 1336, 1339, 1346 (Fed. Cir. 2013) (emphasis added). The *Accenture* court found the claim to "contain only generalized steps of generating a task in response to events." *Id.*

at 1346. Claim 1 is analogous to the invalid claim in *Accenture*. Claim 1's access checker applies

rules—the sensitivity level of the resource and trust level of the mode of identification of the

user—to check to see if an authorized user (i.e., a user with a mode of identification of a

sufficiently-high level) can "perform the determined task" (i.e., access the data resource). *Id.* at

1339.

Moreover, as the United States Supreme Court has held, a "relevant question is whether

the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on

a generic computer." *Alice*, 134 S. Ct. at 2359. The answer in the instant case is no. The '505

Patent recites generic computers and computer servers to implement the idea of limiting access to

data based on permissions. The specification does no more than disclose generic computers and

computer servers to implement the abstract idea. *See, e.g.*, '505 Patent at 7:67-8:4 ("Each internal

network [] has a number of computer systems or terminals [] belonging to users and a number of

servers [] which contain data that may be accessed by users at systems or terminals . . . ."); *id.* at

8:53-568 ("In a preferred embodiment, access filter 203 is implemented on a server and runs under

the Windows NT® operating system manufactured by Microsoft Corporation. In other

embodiments, access filter 203 may be implemented as a component of [a computer] operating

system and/or may be implemented in a router in [virtual private network] 201."). In addition, as

the *Datatrak Int'l* court has held as part of its *Alice* step 2 inquiry, "obtaining permission to access

data is not unique to computing. Certainly, permission must be required before viewing, for

example, an individual's medical records." *Datatrak Int'l, Inc. v. Medidata Solutions, Inc.*, 2015

WL 6870109, at *6 (N.D. Ohio Nov. 6, 2015).

Because the Court finds at *Alice* step one that the '505 Patent claims are directed to an

abstract idea and at step two that there is no inventive concept sufficient to save the claims, the

Court concludes that the '505 Patent claims are patent-ineligible under § 101. Next, the Court

analyzes whether there are open factual disputes that would preclude dismissal on the pleadings.

### 3. Whether There Exist Open Factual Disputes That Preclude Dismissal on the Pleadings

Case No. 18-CV-03685-LHK
ORDER GRANTING MOTION TO DISMISS

Plaintiff's opposition points to attorney argument found in the amended complaint to argue that the amended complaint raises fact questions that cannot be resolved on a Rule 12 motion. Opp. at 15-16. For instance, one of the alleged fact questions is as follows: "[t]hese claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional." *Id.* at 15. Much like Plaintiff's discussion of the '399 Patent, here, the 5 paragraphs of the amended complaint to which Plaintiff cites in Plaintiff's opposition vaguely allege how the '505 Patent is an advancement over the prior art. Opp. at 10. However, there are no *specific* factual allegations or references to the '505 Patent specification—which might disclose that the invention is an improvement over the prior art—that undergird Plaintiff's purported fact questions cited in Plaintiff's opposition.

As aforementioned, under Federal Circuit law, "[w]hether a claim recites patent eligible subject matter is a question of law which . . . has in many cases been resolved on motions to dismiss or summary judgment." *Berkheimer*, 881 F.3d at 1368. "As our cases demonstrate, not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Id.*

Also as discussed above, the *Uniloc* court rejected plaintiff's contentions that the claimed invention did not feature "routine and conventional elements like hardware configurations." 2018 WL 2287675, at *7 (internal quotations omitted). The *Uniloc* court reasoned that the plaintiff was attempting to "*manufacture a factual question*" by relying on attorney arguments. *Id.* (emphasis added). Here, the situation is analogous to that in *Uniloc*. Plaintiff's opposition cites 5 paragraphs of attorney argument found in the amended complaint as grounds for why claimed elements are not routine or conventional. Thus, per the *Uniloc* court, Plaintiff's attorney arguments do not create a factual dispute precluding disposition of the instant case on a Rule 12 motion because Plaintiff's attorney arguments are attempting to manufacture a factual question.

Likewise, the *Cellspin* court found that the plaintiff did not create a factual dispute in a § 101 motion because the plaintiff failed to "identify any portion of the specification which describes the purportedly inventive" concept. 316 F. Supp. 3d at 1154 n.12. Here, Plaintiff's

41

opposition and amended complaint have also failed to identify any particular portion of the specification that would transform ideas in the '505 Patent into non-generic, inventive concepts. Therefore, no factual dispute exists that would preclude this Court from finding the '505 Patent invalid based on a Rule 12 motion.

Thus, Defendant's motion to dismiss the '505 Patent claims is therefore GRANTED.

## IV.     CONCLUSION

For the foregoing reasons, the Court finds that the '399 Patent and the '505 Patent are directed to unpatentable subject matter and are thus invalid under 35 U.S.C. § 101. The Court therefore GRANTS Defendant's motion to dismiss.

**IT IS SO ORDERED.**

Dated: March 13, 2019

_Lucy H. Koh_
LUCY H. KOH
United States District Judge